**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Applicant,**

v.

**MORGAN STANLEY & CO., INC. and Morgan Stanley Dean Witter, Respondents.**

**No. Civ. M18–304 (GEL).**

United States District Court, S.D. New York.

Nov. 28, 2000.

148

Elizabeth Grossman, New York, N.Y. (Sunu P. Chandy, Katherine Bissell, New York, NY,) for Applicant Equal Employment Opportunity Commission, of counsel.

Ronald M. Green, Epstein Becker & Green, P.C., New York, N.Y. (Evan Spelfogel, Frances M. Maloney, Epstein Becker & Green, P.C., New York, NY, of counsel)

for Respondents Morgan Stanley & Co. and Morgan Stanley Dean Witter.

## OPINION AND ORDER

LYNCH, District Judge.

The Equal Employment Opportunity Commission ("EEOC") moves for enforcement of two subpoenas issued to Morgan Stanley & Co., Inc., and Morgan Stanley Dean Witter & Co. (collectively, "Morgan Stanley"), in connection with separate charges of race and/or sex discrimination filed by four African–American women employees under Title VII of the Civil Rights Act of 1964 and/or the Equal Pay Act.

Morgan Stanley argues that the subpoenas should not be enforced, or should be enforced only subject to protective orders, on three separate grounds. It argues (1) that enforcement of the first of the two subpoenas would undermine a potential settlement of the charges brought by one of the charging parties; (2) that any enforcement order should be subject to a protective order imposing certain restrictions on the EEOC's right to share the information with the charging parties and their lawyers, either because such restrictions are required by an earlier order of this Court respecting an earlier EEOC subpoena to Morgan Stanley or because such an order is independently appropriate; and (3) that the subpoenas call for irrelevant information or are unduly vague or burdensome.

Except to the limited extent discussed below, Morgan Stanley's arguments are without merit. The subpoenas will be enforced, subject to certain modifications consistent with this opinion.

## BACKGROUND

*The November 8, 1999, Subpoena*

In June, 1999, Dawn Simmons, an African–American woman employed as an An-

alyst in the Derivative Products Group ("DPG") in Morgan Stanley's New York office, filed a charge with the EEOC alleging that she had been discriminated against and denied equal pay on account of her race, that she had suffered retaliatory treatment because she complained of the discrimination, and that "there has been continuous mistreatment of myself and other African–Americans in the Company." (Boyd Aff. Ex. A, at 5.)[1]

After a mediation effort failed to produce a settlement, the EEOC served a subpoena on November 8, 1999, demanding that Morgan Stanley provide it with various categories of information. Most of the information demanded related to the personnel records of Ms. Simmons and other employees in the "IT Finance Department, and the DPG Controller's Department and/or Division" of Morgan Stanley, and to performance criteria, job descriptions, and employment records of "Junior Accountants, Analysts, Associates, Manager, or Supervisors, including Temporary Employees" in those departments. (Boyd Aff. Ex. D.) In addition, in one category of demand reaching well beyond those departments, the subpoena called for documents reflecting "all claims, formal or informal, internal or external, [of] race discrimination and harassment made against your organization during the past three (3) years" and what was done in response to such claims. (*Id.* ¶¶ 23–24.)

The Court will spare the reader the usual tedious history of requests for information, demands and counter-demands, productions and objections, negotiations and arguments that preceded and followed the issuance of the subpoena. Suffice it to say that by the time the EEOC moved in this Court for enforcement of the subpoena, on September 25, 2000, several classes of documents called for by the subpoena remained unproduced, and Morgan Stanley had clearly preserved its position that

---

1. Her initial charge also alleges gender discrimination, although the basis for this charge is unclear. (*See* Boyd Aff. Ex. A, "Charge of Discrimination".) The EEOC subpoena relating to this charge seeks information primarily relevant to race discrimination.

the subpoena was overbroad, burdensome and vague, and that any documents produced should be subject to confidentiality requirements beyond those to which the EEOC would agree.

By that time, too, Ms. Simmons, the charging party, had entered into a settlement agreement with Morgan Stanley. While the parties to that agreement insist that "the terms of the settlement are confidential" (11/13/2000 Letter, Green to Court, at 1), and the agreement itself has not been made a part of the record of this proceeding, counsel for those parties nevertheless chose to advise the Court that the agreement provides for a cash payment to Ms. Simmons, as well as relocation and vocational benefits, and is "of course, [*sic*] contingent on Ms. Simmons securing the withdrawal of her EEOC charge." (*Id.*) Ms. Simmons accordingly requested the EEOC to discontinue its investigation of her charges, but the EEOC replied that "because [the charging party] made class allegations in her charge, and because independent evidence exists to support her claim, EEOC's responsibility is to advance the public interest by continuing the investigation." (10/27/2000 Letter, Grossman to Morelli.) Since the actual text of the settlement agreement is not before the Court, and since Ms. Simmons is not a party to these proceedings, it is not appropriate for this Court to express any view about whether Ms. Simmons and Morgan Stanley have or have not finally settled any dispute between themselves. It suffices for purposes of this motion to note that Morgan Stanley has taken the position here that the dispute is *not* settled, because its obligations to Ms. Simmons were contingent not merely on her using her best efforts to persuade the EEOC to close its case, as she has apparently done, but on her actually securing termination of the EEOC's pursuit of the matter, which she has been unable to do. (*See* Tr. 14, 18.)[2]

*The June 9, 2000, Subpoena*

Meanwhile, during October and November, 1999, three other African–American women employed by Morgan Stanley also filed charges, variously alleging race and/or gender discrimination in violation of Title VII, sexual harassment, retaliation, and violations of the Equal Pay Act. Each of the other three complainants work in different capacities and in different departments from Ms. Simmons. Renay Smith works as a Sales Assistant, while Helen Thompson and Allison Mucthison are employed in the Insurance Operations Department as Unit Leader and Senior Operations Clerk, respectively. As in the case of Ms. Simmons, the EEOC and Morgan Stanley engaged in a lengthy series of moves and countermoves concerning the EEOC's requests for documents, culminating in the issuance of a subpoena on June 9, 2000, Morgan Stanley's failure to provide at least some of the documents demanded, and the inclusion of this subpoena in the EEOC's September 26, 2000, application for enforcement. Like the earlier subpoena, the June 9, 2000, subpoena sought personnel records relating to the charging parties' departments and job classifications, in this instance, "Senior Insurance Operations Clerks" and "Operations Unit Leaders" in the "Insurance Service Department in the New York Branch," and "Sales Assistants assigned to Financial Advisors." Like the earlier subpoena, this one also included a broad demand for information about "all claims, formal or informal ... alleging race or sex discrimination made against your organization" within particular time periods. (Boyd Aff. Ex. M.)

*The Schieffelin Litigation*

The discussion above sets forth the procedural history of the particular subpoenas sought to be enforced in this case. But

---

**2.** "Tr." references are to the transcript of oral argument before this Court on November 14, 2000.

that history needs to be supplemented by an account of yet another subpoena enforcement battle between the EEOC and Morgan Stanley, which may well have a significant bearing both on the outcome of this proceeding and on an understanding of the litigation tactics of the parties.

Nearly a year before Ms. Simmons filed her complaint, in November, 1998, yet another female Morgan Stanley employee, Allison Schieffelin, filed a charge of sex discrimination and retaliation with the EEOC. (There was no charge of race discrimination, and Ms. Schieffelin's race is apparently not disclosed in the present record.) Ms. Schieffelin was a higher-ranking employee than the charging parties discussed above; she was a Principal in the firm who complained that she was unfairly denied promotion to Managing Director, and she clearly alleged a widespread pattern of discrimination against women in the firm. (*See* Green Aff. Ex. A, at Supp. 1.)[3] In her case, too, the EEOC sought broad-ranging disclosure of documents from Morgan Stanley, the familiar dance of resistance and negotiation was performed, and in July, 1999, the EEOC sought enforcement of the subpoena in this

Court. And in her case, too, Morgan Stanley objected to some of the EEOC's demands and argued that the EEOC should be ordered to hold any documents produced in strict confidence.

After briefing and argument,[4] the Honorable Denise L. Cote, District Judge, who was then sitting in the miscellaneous applications part of the Court, entered two orders. First, in an opinion filed on September 23, 1999, Judge Cote rejected Morgan Stanley's argument that the information about complaints of discrimination sought by the EEOC were irrelevant to Ms. Schieffelin's charge, ruling that the complaints

> may "cast light" on Schieffelin's allegations regarding the existence of the discrimination she has allegedly experienced as well as the existence of the class-wide discrimination she describes.

*EEOC v. Morgan Stanley & Co.*, No. M 18–304, 1999 WL 756206, 1999 U.S. Dist. LEXIS 14661, at *6 (S.D.N.Y. Sept. 23, 1999).

Second, after hearing further argument, the Court entered another order on November 2, 1999—just one week before the EEOC filed its subpoena in Ms. Simmons'

---

3. It is perhaps worth noting that Ms. Schieffelin's case was a rather more high-profile matter than those now before the court. So far as the Court has been able to determine through computer searches of the usual databases, there has been no press coverage of Ms. Simmons' charges of discrimination. Whether because they involved a higher-ranking and more highly-paid employee, or because they involved charges of client entertainment at topless bars, Ms. Schieffelin's complaint, the EEOC's efforts to enforce its subpoena, and the subsequent course of the EEOC's proceedings have been extensively covered in the national and even international media. *See* Riva P. Atlas, *Morgan Stanley Fires Bond Trader Who Filed Bias Complaint*, N.Y. TIMES, Oct. 26, 2000, at C6; Anthea Lawson, *A Week In The City*, THE TIMES (LONDON), June 10, 2000; James Bone, *U.S. Bank faces $200 Million Payout*, THE TIMES (LONDON), June 7, 2000; Judith Schoolman, *Brokerage Hit On Bias; EEOC: Morgan Stanley Discriminated Against Exec, Other Women*, N.Y. DAILY NEWS, June 6, 2000, at 32; Patrick McGeehan, *Morgan Stanley Is Cited For Discrimination*

*Against Women*, N.Y. TIMES, June 6, 2000, at C1; Reed Abelson, *If Wall Street Is A Dead End, Do Women Stay To Fight Or Go Quietly?*, N.Y. TIMES, Aug. 3, 1999, at C1; Joseph Kahn, *Morgan Stanley and U.S. Panel Given Deadline on Case Dispute*, N.Y. TIMES, July 30, 1999, at C7.

4. The record is unclear as to what materials were before Judge Cote at the time she entered her orders. The EEOC submitted an affidavit and memorandum of law with its motion to enforce its subpoena. Morgan Stanley requested an adjournment of its deadline to submit opposition papers, since the parties were in the process of resolving some of their disputes. The Court file does not appear to contain any written submission from Morgan Stanley in opposition to the EEOC's motion. Judge Cote's second order notes that oral argument was held on two separate occasions, once by telephone and once in person. *See EEOC v. Morgan Stanley & Co.*, No. M18–304 (DLC), at 1 (Nov. 2, 1999).

case—directing Morgan Stanley to produce the bulk of the other items demanded in the EEOC's subpoena. *See EEOC v. Morgan Stanley & Co.*, No. M 18–304(DLC) (S.D.N.Y. Nov. 2, 1999). Most of these documents related specifically to Ms. Schieffelin's position in the firm: Morgan Stanley was ordered to produce job descriptions of Principals and Managing Directors in the Institutional Equity Division–North America, profiles of individuals employed in those capacities, documents relating to the termination of such individuals, information about persons considered for promotion to Managing Director, the criteria and process for promotion from Principal to Managing Director in that Division, and an organization chart of same. (*See Id.* ¶¶ 1–7.) In one broader category of discovery, consistent with its earlier opinion, the Court ordered the production of all "formal written" complaints (as specifically defined in the order) of sex discrimination or sex harassment from January 1, 1995 to the date of the order for all its United States-based offices. (*See id.* ¶ 8.) [5]

In addition to ordering these disclosures, Judge Cote imposed a protective order limiting the EEOC's dissemination of the information provided. Noting that the scope of the disclosure ordered was predicated on the "breadth of the investigatory power of the EEOC," in apparent contrast to the kind of discovery that might be obtainable by plaintiffs in a private civil action under Title VII, the Court ordered

> that the documents and information produced pursuant to this Order shall be held strictly confidential by [the EEOC] and shall not be released or disclosed by the EEOC whether during this investigation or thereafter to the Charging Party, her attorney or anyone else whether pursuant to the Freedom of Information Act or otherwise. Nothing in this Order shall prevent EEOC from

using any information obtained pursuant to this Order in furtherance of a lawsuit it commences against [Morgan Stanley].

(*Id.* ¶ 9.)

This order, entered without an explanatory opinion, forms the basis for Morgan Stanley's claim that the EEOC is collaterally estopped from objecting to the entry of a similar protective order with respect to the documents sought in the instant application.

## ANALYSIS

Morgan Stanley's three objections to enforcement of the subpoena will be taken up in turn.

### I. *The Simmons Settlement*

■ Blithely assuring the Court that "Ms. Simmons' Charge lacks merit," and that it has nevertheless entered a settlement that provides her with "substantial benefits," Morgan Stanley urges the Court, without citation to any legal authority whatsoever, to "flatly reject the EEOC's request" for enforcement, and instead to "direct the EEOC to withdraw its Subpoena and approve Ms. Simmons' request for withdrawal of her Charge so that she can proceed to implement to her advantage the settlement into which she has entered." (Resp. Mem. Opp., at 10.)

The argument is totally without merit. Morgan Stanley cites no authority that authorizes a Court to direct the EEOC to withdraw subpoenas, or to overrule its decisions whether to persist in investigations begun in response to individual complaints of discrimination. As the EEOC correctly points out, if the EEOC were foreclosed from pursuing investigations whenever the charging party whose charge occasioned the inquiry wished to settle with his or her employer, employers would be able to forestall investigations into their employment practices by "buying off" any victim who

---

5. The Court's order in this respect implicitly declined to enforce the EEOC's demand for records of any "informal" complaints of discrimination.

had the temerity to complain. (*See* Tr. 8) Unsurprisingly, this is not the law.

■ EEOC regulations fully authorize its staff to pursue investigations of charges that may yield evidence of discrimination against a protected class of employees, even if the original charging party wishes to withdraw the charge and settle the case. Specifically, those regulations provide that a charge may only be withdrawn by the charging party with the consent of the Commission, and only so long as the withdrawal of the charge will not "defeat the purposes of Title VII." 29 C.F.R. § 1601.10 (2000). In any event, the EEOC may continue its investigation "notwithstanding a request by a charging party to withdraw a charge." 29 C.F.R. § 1626.13 (2000).

The authority claimed in these regulations has been repeatedly upheld by courts. *See EEOC v. Citicorp Diners Club, Inc.,* 985 F.2d 1036, 1040 (10th Cir. 1993) (charging party's settlement with employer does not necessarily end the investigatory and enforcement powers of the EEOC); *EEOC v. Huttig Sash & Door Co.,* 511 F.2d 453 (5th Cir.1975) (granting of charging party's motion for leave to dismiss action did not provide sufficient grounds for dismissal of action brought by EEOC); *EEOC v. McLean Trucking Co.,* 525 F.2d 1007 (6th Cir.1975) (settlement of private suit by charging party did not preclude bringing of action by EEOC pursuant to its own investigation); *EEOC v. United States Fidelity and Guaranty Co.,* 414 F.Supp. 227, 246 (D.Md.1976) (EEOC's refusal to permit complainant's withdrawal of charge was within its discretion). Moreover, the EEOC undeniably possesses investigative and enforcement powers that are independent of any action by a charging party at all. *See Gen. Tel. Co. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (authorization of

"private-action rights suggest that the EEOC is not merely a proxy for the victims of discrimination"); *EEOC v. Johnson & Higgins, Inc.,* 91 F.3d 1529, 1537 (2d Cir.1996) (EEOC may file suit even where a charge was not filed by an affected employee).[6]

Even assuming that this Court had some power to review the EEOC's decision to continue with the investigation given the satisfaction of Ms. Simmons' demands, that decision is, on this record, entirely reasonable. Ms. Simmons clearly alleged a pattern and practice of racial discrimination at Morgan Stanley, not merely an isolated instance of discrimination against herself. (*See* Boyd Aff. Ex. A, at 5.) Even apart from Ms. Simmons' complaint, now potentially resolved by Morgan Stanley's proffer of a settlement, the EEOC also has before it the complaints of other African–American women, employed in different positions in other departments, that they have been discriminated against, not to mention other claims of racial discrimination by the same employer brought by still other individuals in yet other positions.[7] Needless to say, these various allegations may prove entirely baseless. Hearsay reports in the press, Ms. Simmons' generalized accusation of a widespread pattern of racial discrimination, and the as-yet unverified charges of the other charging parties, do not constitute admissible evidence establishing misconduct by the employer. But such information certainly justifies the EEOC in determining that an investigation into the allegations is called for, and should not be inhibited in the interests of a favorable settlement for a single charging party. Indeed, given this record it would be remarkable if the agency charged with enforcing equal employment

**6.** Although these cases deal with the EEOC's ability to bring litigation based upon what it finds, this power would be clearly meaningless if it did not have the power to investigate.

**7.** *See* Patrick McGeehan, *Bias Case Against Morgan Stanley Settled,* N.Y. TIMES, Sept. 16, 2000, at C14; Joseph Kahn, *Employees Lawsuit Accuses Morgan Stanley Of Racial Bias,* N.Y. TIMES, Aug. 18, 1999, at C7; Schoolman, *supra* note 3.

laws decided to abandon or restrict its investigations based on the proposed settlement of this one claim.

It should be pointed out, finally, that Morgan Stanley's characterization of the EEOC as blocking a favorable settlement for Ms. Simmons displays considerable chutzpah. Whether Morgan Stanley regards Ms. Simmons as a victim of discrimination or a nuisance plaintiff, nothing in the EEOC's action precludes Morgan Stanley from settling with her, and thus avoiding any risk of further liability to her, if it chooses to do so. At oral argument, counsel for Morgan Stanley pointed out that this would be undesirable, because Ms. Simmons "will still be a witness in the case advanced on her behalf" against Morgan Stanley by the EEOC. (Tr. at 4.) But, while Morgan Stanley is entitled to resolve its dispute with an employee by offering her a financial settlement, it is not entitled by thus settling to eliminate the employee as a witness if she is called by a government agency in an investigation or litigation of possible illegal conduct on its part, any more than an accused criminal can foreclose a government investigation or keep his victim off the witness stand by offering compensation to that victim. Morgan Stanley is perfectly free to settle or not with Ms. Simmons, to settle or not with the EEOC, or to settle with Ms. Simmons only as part of a global settlement with the EEOC, as it chooses, but it cannot force the EEOC to settle. Nor can Morgan Stanley blame the EEOC for undermining its proposed settlement with Ms. Simmons because it, Morgan Stanley, refuses to settle with her unless the EEOC abandons its legitimate investigation.

In short, nothing about Morgan Stanley's conditional settlement offer compels the EEOC to withdraw its subpoena, or gives this Court any basis to direct it to do so.

II. *Collateral Estoppel and Protective Order*

■ Morgan Stanley's second argument is more colorable. That argument is that Judge Cote's order in the Schieffelin matter collaterally estops the EEOC from objecting to its demand for a protective order limiting the EEOC's use of the information, or, alternatively, that this Court should enter such an order with respect to the instant subpoenas, even if it is not bound to do so by the earlier order. Analytically, the collateral estoppel argument is logically prior: if Judge Cote's order controls the case, then the independent merits of the demand for a protective order need not be addressed. But to understand what is at stake in the protective order issue, it is necessary to begin with the more general arguments made by the parties.

Law enforcement and our system of justice depend on the ability of investigators, litigants, and courts to acquire information, sometimes from reluctant parties. Subpoena power exists to promote that interest. At the same time, the owners or possessors of the information have a legitimate interest, recognized by law, in ensuring that government officials use subpoenaed information only for the purposes for which the power is granted. People and corporations have legitimate interests in protecting the privacy of information. Not only is personal privacy a matter of fundamental human dignity, but information can also have substantial economic value—as the current catch-phrase "Information Economy" constantly reminds us.

■ For these reasons, the law unquestionably limits what the EEOC can do with documents and information provided in response to its subpoenas. Section 709(e) of Title VII makes it "unlawful"—indeed, makes it a misdemeanor backed by criminal penalties -

for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its [subpoena power] prior to the institution of any

proceeding under this subchapter involving such information.

42 U.S.C. § 2000e–8(e). The EEOC and its staff, thus, may use the information for its legitimate investigative purposes, and reveal it in the course of any enforcement proceeding it undertakes, but may not indiscriminately make it known to the public—whether by press leak, internet posting, or good old-fashioned gossip.

As Morgan Stanley points out, this protection does not completely eliminate privacy concerns. First, many government records are vulnerable not only to the kind of accidental or malicious leaks by officials prohibited by Section 709(e), but also to disclosure pursuant to requests by members of the public under the Freedom of Information Act. *See* 5 U.S.C. § 552. But Morgan Stanley's concerns about this statute seem exaggerated. The EEOC points out that several exceptions to FOIA's disclosure requirements appear to cover the sort of records at issue in this case. For example, 5 U.S.C. § 552(b)(3) specifically exempts from availability under FOIA all "matters that are specifically exempted from disclosure by statute." This would certainly seem to cover documents that section 709(e) of Title VII prohibits the EEOC to disclose. *Cf. Parker v. EEOC,* 534 F.2d 977, 980 (D.C.Cir.1976) (§ 552(b)(3) applies to EEOC settlement agreements required not to be made public under 42 U.S.C. § 2000e–5(b)). Other exemptions might also apply. *See* 5 U.S.C. §§ 552(b)(4) (confidential commercial information); 552(b)(6) (personnel files); 552(b)(7) (information compiled for law enforcement purposes). The EEOC has represented on the record of this case that its unvarying practice is to resist FOIA requests for information of the sort at issue here, and nothing either in this record or in the public record that has been called to my attention casts any doubt on that representation. (*See* Tr. 30–31.) The matter before me does not require or permit a conclusive determination of any issue that may be presented at some future point by a FOIA request for such material. The record is sufficient, however, for me to conclude that the threat of disclosure under FOIA is too remote to require any special protective order.[8]

Second, Morgan Stanley argues that it should have protection for its documents not only from the general public, but also from the complaining parties. The EEOC responds that it will keep any subpoenaed documents for its own use, abide by the prohibition of Section 709(e) on releasing information to the public, and resist FOIA requests in accordance with its usual practice and in reliance on the exceptions discussed above, but that it reserves the right to share information obtained in the investigation of a charging party's case with that charging party. In support of its position, it cites *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981), in which the Supreme Court held that a lower court had erred "in holding that respondent had a categorical right to refuse to comply with the EEOC subpoena unless the Commission assured it that the information supplied would be held in absolute secrecy"—precisely the assurance that Morgan Stanley demanded from the EEOC in this case. *Id.* at 604, 101 S.Ct. 817. In a careful opinion, the Court held that "Congress did not include charging parties within the

---

**8.** Nothing in this opinion, moreover, should be taken to imply that Morgan Stanley would be entitled to a protective order if FOIA clearly did authorize disclosure. If Title VII required Morgan Stanley to provide documents to the EEOC, and FOIA in turn required the EEOC to make the documents available to the public, it would be strongly arguable that, taken together, the two statutes simply reflected a congressional determination that the

public under certain circumstances could obtain access to the documents. There is no need, however, to speculate about how any such issues would be resolved. The discussion in the text assumes arguendo, as the parties have, that Morgan Stanley might be entitled to relief if records subpoenaed from it could be made easily available to the public, and concludes that that is not the case here.

'public' to whom disclosure of confidential information is illegal under [Section 709(e) ]." *Id.* at 598, 101 S.Ct. 817.

■ The Court reasoned that the language, legislative history, and purpose of Title VII all supported this conclusion: First, it noted that a parallel provision, Section 706(b), codified at 42 U.S.C. § 2000e–5(b), prohibits the Commission from making "public" charges filed by charging parties, a provision that makes no sense if the charging party, who by definition has access to the charge, counts as a part of the "public." *Id.* Second, it noted that proponents of the bill explained that the ban on publicity was not intended to hamper the Commission in carrying out its legitimate functions, but rather at making unproved charges available to "the general public," a category that the Court found did not extend to parties to the proceeding. *Id.* at 599–600, 101 S.Ct. 817 (citing 110 Cong. Rec. 12723 (remarks of Senator Humphrey)). Third, it noted that permitting disclosure to the charging party would further both the investigative activities of the Commission and the Act's purpose of coordinating judicial and administrative enforcement of Title VII. As the Court observed, "limited disclosure to the [charging] parties can speed the Commission's required investigation: the Commission can more readily obtain information informally—rather than through its formal [subpoena] powers under 42 U.S.C. § 2000e–9—if it can present the parties with specific facts for them to corroborate or rebut." *Id.* at 600–601, 101 S.Ct. 817. The Court went on to point out that such disclosures may also help the charging party evaluate his or her case, and thus decide whether to settle or sue. *Id.* at 601, 101 S.Ct. 817.[9]

In the face of this controlling authority, to which Morgan Stanley surprisingly fails

to refer in its brief, Morgan Stanley's position would appear difficult to justify. As the Supreme Court has interpreted Title VII, Congress has specifically foreseen and approved of the EEOC's practice of sharing information with charging parties, because that practice is consistent with and promotes the statutory purpose. The holding of *Associated Dry Goods* does not necessarily foreclose the existence of discretion in a district court to enter a protective order in extraordinary circumstances. After all, the Supreme Court in that case was primarily concerned with rejecting an argument that section 709(e) *by its own force* prohibited disclosure to the charging party in all cases; it did not expressly consider whether a district court might have the authority to enter a protective order prohibiting such disclosure in circumstances where the particular nature of the information or of the charging party made such an order appropriate. But at a minimum, the logic of *Associated Dry Goods* makes plain that because disclosure to the charging party would ordinarily further the enforcement of the Act, disclosure should be the norm and such orders will be appropriate only in unusual circumstances.

That has indeed been the practice. Apart from Judge Cote's order, discussed below, the only reported opinion entering a protective order such as that sought by Morgan Stanley is *EEOC v. C & P Telephone Co.,* 813 F.Supp. 874 (D.D.C.1993). In that case, the EEOC subpoenaed information about tests used by an employer to judge applicants for a particular job. The Court found that if the EEOC disclosed the contents of the test to the charging party, and that party, a union representing the employer's workers, disseminated the test to its members, "the test would, in effect, be destroyed." *Id.* at 876. The

---

**9.** The Court went on to hold that its reasoning applied only to the charging party in a particular matter. Information obtained in connection with one charge may not be shared with charging parties who had brought other, potentially related, charges. As the Court held,

a charging party "must be considered a member of the public with respect to charges filed by other people. With respect to all files other than his own, he is a stranger." *Associated Dry Goods,* 449 U.S. at 603, 101 S.Ct. 817.

protective order issued there was clearly based on the Court's conclusion that there was an unusually compelling need because of the nature of the particular information in question.[10] Moreover, the legality of even the limited order in *C & P Telephone* has been questioned by a court facing the same issue of test disclosure, where the case for special protection was far more compelling than anything shown here.[11]

■ Morgan Stanley makes only the most perfunctory attempt to argue that there is anything at all unusual in this case that would justify prohibiting disclosure to the charging party. In its brief, it claims that "[t]he EEOC consistently has ignored or rejected Morgan Stanley's good-faith efforts to obtain reasonable protection for its confidential information," and argues that the EEOC's position is "unsupported by any justifiable need to obtain, and to provide others, unfettered access to Morgan Stanley's confidential information." (Resp. Mem. Opp., at 14.) But this rather misstates the issue. First, the EEOC has not rejected "reasonable protection" for the information, or claimed the right to provide "others" with "unfettered access."

Rather, it has insisted that it will abide by its statutory obligation not to disseminate materials except to one narrow category of person: the parties to the proceeding and their attorneys. Second, it is not for the EEOC to demonstrate a "justifiable need" to provide information to those parties. As *Associated Dry Goods* makes clear, that will be the norm with respect to ordinary charging parties and the usual sorts of information obtained in an EEOC investigation. It is for Morgan Stanley to demonstrate a reason why the disclosure of the information sought in these subpoenas to these particular parties is somehow outside the scope of the ordinary situation contemplated by Congress and the Supreme Court.

■ At oral argument, Morgan Stanley proffered additional arguments. First, it argues that *Associated Dry Goods* approved disclosure only to the charging party, and not to that party's counsel. Accordingly, it claimed, counsel should be treated as a member of the "public" and disclosure to the charging party's lawyer should not be permitted. (Tr. 39.) This verges on the frivolous. While many

---

10. The other cases cited by Morgan Stanley (Resp. Mem. Opp., at 14) provide no support whatever for the relief requested. *United States v. Exxon Corp.*, 628 F.2d 70 (D.C.Cir. 1980), approved a protective order in a case involving the Department of Energy, not the EEOC, and is thus irrelevant to the question of disclosure to charging parties under the particular regulatory structure established by Title VII. The court in *EEOC v. Local 75, Laborers Int'l Union*, 1982 WL 469 (N.D.Ill. 1982), did not enter a protective order or address what sort of order if any would be appropriate on the facts of that case; it simply noted that a court may utilize a protective order to assure the confidentiality of documents, and offered to entertain a motion for such an order. In *EEOC v. Univ. of Pittsburgh*, 487 F.Supp. 1071 (W.D.Pa.1980), *aff'd*, 643 F.2d 983 (3d Cir.1981), the district court did indeed enter a protective order relating to allegedly confidential salary information subpoenaed by the EEOC. But the order in question directed the EEOC to "make no disclosure of the investigative material except in accordance with [its own] regulations"—specifically citing the very regulations permitting

disclosure to "charging parties, or their attorneys, respondents or their attorneys or witnesses where disclosure is deemed necessary for securing appropriate relief" that Morgan Stanley would have this Court override. 487 F.Supp. at 1078 (quoting the EEOC Compliance Manual). The Court in *University of Pittsburgh*, in fact, acting prior to the Supreme Court's decision in *Associated Dry Goods*, specifically rejected the University's request for a broader protective order, adopting the same reasoning later used by the Supreme Court to find that disclosure to charging parties was specifically approved by the Act.

11. *See EEOC v. City of Milwaukee*, 54 F.Supp.2d 885, 895–96 (E.D.Wis.1999). In that case, although the parties ultimately failed to execute a confidentiality stipulation, the EEOC proposed some additional promises of confidentiality, which may have changed the balance of equities. Nevertheless, the *Milwaukee* court made clear that it disagreed with the result in *C & P Telephone* even on the facts presented there. *Id.*

charging parties act *pro se,* it is both common and appropriate for them to act through counsel if they so choose and can afford to do so. Where a charging party is represented, he or she will normally rely on counsel to interact with the EEOC and to advise him or her about the merits of the claim. That, after all, is the whole point of having a lawyer. The idea that the purposes identified by the Supreme Court in *Associated Dry Goods*—obtaining investigative assistance from the charging party and helping the charging party to evaluate his or her case—could be furthered by providing the information to the party behind the back of counsel does not merit further discussion.

Second, Morgan Stanley claims that even if counsel is covered by the *Associated Dry Goods* rule, a protective order is warranted where the charging party is represented by counsel, because specialized plaintiffs' counsel in Title VII cases will be able to use documents provided in one case in order to further other cases. (Tr. 26, 35–7.) This argument is also unpersuasive. That a charging party is represented does not render the case unusual, or separate it from the normal run of cases in which disclosure to the charging party is the norm. It would be perverse if parties who retained counsel were disadvantaged by being denied cooperation from the EEOC that would be routinely extended to unrepresented parties.

Nor is it clear that the sort of "use" of the documents by counsel contemplated by Morgan Stanley would be improper or abusive. Certainly, under the terms of *Associated Dry Goods* disclosure is to *the charging party,* not to counsel, and counsel is authorized to see and use those documents only as an agent and advisor of the charging party, and not in his or her own right. If counsel were to offer to sell confidential documents to a competitor of Morgan Stanley, that would surely be an abuse, and some form of relief would surely be proper if such action were threatened. But there is nothing whatever in the record suggesting that any counsel contemplates such conduct, or indeed that any lawyer has ever engaged in such a practice with EEOC documents. If a lawyer, educated about Morgan Stanley's employment practices by reviewing documents in one case, "uses" the knowledge thus obtained to make better discovery demands in another case, or otherwise to improve his or her strategic decisions in such other matter, that is a normal consequence of the discovery process. To the extent Morgan Stanley believes there would be anything improper about such a lawyer appearing in the second case, or attempting to introduce documents in that case that were obtained in the first case, or even soliciting clients who maybe revealed by the documents as potential victims of discrimination, those matters may be raised in the later litigation, or in a disciplinary complaint. But such potential actions are entirely speculative, are in no way distinctive to this case, and do not justify a preemptive strike forbidding the normal cooperation between the EEOC and the charging party contemplated by Title VII.

Thus, I am persuaded that there is no justification on this record for the entry of a protective order with reference to the subpoenas before this Court, and no reason to order the EEOC to depart from its normal practices, held in *Associated Dry Goods* to be entirely legal and consistent with the aims of the statute in ordinary cases.

■ In light of this conclusion, Morgan Stanley's eagerness to rely on Judge Cote's order becomes clearly understandable. Morgan Stanley contends that I need not, and indeed cannot, decide this issue, since EEOC is collaterally estopped by the earlier order. This argument, however, is without merit.

The Supreme Court has made clear that "the doctrine of mutual defensive collateral estoppel is applicable against the government to preclude relitigation of the same issue already litigated against the same

party in another case involving virtually identical facts." *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 169, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); *see also Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Morgan Stanley argues that Judge Cote's decision in the Schieffelin matter conclusively determined that Morgan Stanley is entitled to a protective order denying charging parties and their lawyers access to documents subpoenaed from it by the EEOC. In order to prevail on this argument, however, Morgan Stanley would have to show that the government is seeking to relitigate "the same issue" litigated before Judge Cote, and that the case before her and the one before me "involv[e] virtually identical facts." This it cannot do.

Determining the issues litigated in the earlier matter is rendered somewhat more difficult by the fact that the earlier case resulted in no opinion explaining the contentions of the parties and the reasoning of the Court. All that can be done is to examine what the Court actually did, and what facts were before the Court. What the Court did was to order that the EEOC not divulge to the charging parties or their attorneys the information ordered to be produced pursuant to the Schieffelin subpoenas. Logically, this must mean that the Court decided two things: (1) as an abstract legal principle, a district court has the authority to issue a protective order, in at least some circumstances, preventing the disclosure of EEOC-subpoenaed materials to the charging party, notwithstanding the holding in *Associated Dry Goods* that section 709(e) itself does not prohibit such disclosure; (2) on the particular facts before the Court, such an order was appropriate.

Whether or not the EEOC is estopped from disputing the first proposition, however, is irrelevant to the disposition of this case. As discussed above, this Court accepts, at least for purposes of this opinion, the proposition that under appropriate circumstances, such a protective order would be permissible.[12] The issue before the Court, however, is whether there is any compelling justification for doing so in this case.

Judge Cote's order cannot preclude litigation of that issue, since that issue was not before the court in the prior case. The issue in that case was whether the facts before the Court in the Schieffelin matter justified a protective order relating to *that* subpoena. In the absence of an opinion, it is impossible for this Court to know what factors led Judge Cote to the conclusion that a protective order was justified there. It is clear enough, however, that the facts of the Schieffelin case are anything but "virtually identical" to the facts before this Court.

At the outset, there is reason to doubt that issue preclusion could ever apply in connection with the intensely fact-specific and discretionary balancing of the equities involved in determining the desirability of a protective order with respect to two different subpoenas. As is typical of subpoenas, the instant subpoena and the one before Judge Cote sought (for the most part) different information about different types of employees, and the parties and lawyers to whom disclosure will or will not be made are different. Almost inevitably, a fact-sensitive determination of whether the particular information sought in one case needs to be protected from disclosure to the particular parties involved will be a very different matter from determining whether other information in a different case should be withheld from entirely different parties.

In these particular cases, moreover, the facts are quite distinguishable. In the Schieffelin matter, the information sought

---

12. As indicated above, it is this Court's conclusion that such an order would be appropriate only in unusual cases, and that there should be a presumption against such orders in most cases. There is nothing whatever in Judge Cote's order suggesting that she applied a different standard or had a different view of the law.

to be disclosed related to employees at the highest level. Information about their personnel files might well have been of great interest to the press or to Morgan Stanley's competitors. Moreover, as noted above, there had in fact been intensive press interest in the Schieffelin case—which was apparently thought by some to provide an unusual glimpse into alleged "glass ceilings" facing female Wall Street executives—before, during and after the Court's ruling.[13] Some of that publicity, in fact, related directly to the subpoena enforcement proceeding before Judge Cote.[14] On these facts, it would be reasonable to conclude not only that the information in question was particularly sensitive, but also that providing the information to parties and counsel engaged in a highly-publicized dispute might enhance the risk of disclosure of the information to the public at large, the very result that section 709(e) attempts to prevent.

The case before me is quite different. The pattern of sex and race discrimination that EEOC is investigating here relates to relatively low-level employees. For good or ill, the press has seemed totally uninterested in the cases of these less wealthy employees, whose allegations, even if true, involve garden-variety prejudice in ordinary workplaces, and not the glamor of high-flying investment bankers' country-club golf outings or the squalor of their trips to strip-tease clubs. As demonstrated above, Morgan Stanley has provided absolutely no reason to believe that the information sought by these subpoenas is especially sensitive, or would be of any great interest to the public or to its competitors, relying instead on arguments that could be made by any large employer in any EEOC investigation.

Thus, nothing about Judge Cote's decision, on the quite different facts before her, precludes this Court from deciding independently, on the distinct facts before

it, whether a protective order is justified on this record.

One final point needs to be addressed before leaving this issue. Although the bulk of the documents sought in these subpoenas involve entirely different documents than those in the Schieffelin subpoenas (because they seek personnel records of employees at entirely different levels in completely different divisions of the firm), one category of overlap exists. In both Schieffelin and in these subpoenas, the EEOC sought, as it apparently routinely does, disclosure of all complaints of sex (and also, in the instant case, race) discrimination made throughout the firm over a period of several years. Thus, one distinct category of the documents sought by these subpoenas has already been produced, in the Schieffelin case, subject to Judge Cote's protective order. It is of course arguable that even as to these documents, collateral estoppel might not apply, since the earlier case involved different parties and different publicity risks, which may have affected the decision. On the other hand, it could also be argued that it would be particularly unseemly to allow the EEOC to escape the rigors of a protective order entered in one case by seeking the same protected documents in a different case. The matter need not be resolved, however, because the EEOC has agreed on the record that any documents covered by the protective order in the prior case will be held subject to similar prohibitions under the instant subpoenas. (Tr. 44–5.) The order eventually entered in this case will reflect that concession.

### III.  *Relevance, Vagueness and Burden*

■ Finally, Morgan Stanley argues that various categories of demands in the instant subpoenas are either irrelevant to the investigation, or are too vague to be complied with, or would be unduly burdensome to produce. These arguments do not

---

**13.**  *See* Schoolman, *supra* note 3; Abelman, *supra* note 3.

**14.**  *See* Kahn, *supra* note 3.

require extended scrutiny, and with one exception, they are rejected.

Many of the documents sought by the subpoenas have already been produced. Morgan Stanley's brief lists six categories of document as to which it continues to press objections. In evaluating these demands, it should be kept in mind that "courts have generously construed the term 'relevant' and have afforded [the EEOC] access to virtually any material that might cast light on the allegations against the employer." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–9, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984); *see also Univ. of Pittsburgh*, 487 F.Supp. at 1076 (subpoenas will be enforced unless "plainly incompetent or irrelevant to any lawful purpose"); *EEOC v. Cambridge Tile Manufacturing Co.*, 590 F.2d 205 (6th Cir.1979) (relevance for the purposes of investigation is to be broadly construed); *Motorola, Inc. v. McLain*, 484 F.2d 1339, 1345–46 (7th Cir.1973) (same). All of the document demands still at issue are entirely relevant to the investigation being conducted by the EEOC. Indeed, they seek precisely the kind of documents an investigator would naturally seek to determine whether there is any merit to the charging parties' claims of discrimination, and to the EEOC's reasonable suspicions, based on the number of complaints it has received and the claims of some of the charging parties that their complaints were not isolated examples, that there may be patterns of discrimination in the departments involved. Three of the disputed categories seek lists of employees, going back several years, in the departments where Ms. Simmons worked, and the personnel records of those employees in job titles related to hers. The demands are narrowly tailored to the facts of her complaint. The other three categories seek information about other complaints of race and sex discrimination throughout the firm. In view of the number of complaints at issue against this employer, it is entirely reasonable for the EEOC to inquire whether other complaints have been made within the firm in order to determine whether to widen its inquiry.[15] Other than to quibble over just how many years' worth of personnel files should be required, Morgan Stanley presents no reason why these records are not relevant.

Neither are the demands, with one exception, unduly vague or burdensome. In assessing the burdensomeness of a subpoena the Court must show "that the cost of gathering this information is unduly burdensome in light of the company's normal operating costs." *See EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 479 (4th Cir.1985). At oral argument, Morgan Stanley candidly admitted that it cannot plausibly claim that the limited volume of documents requested here even remotely approaches that standard. (*See* Tr. at 49–50.)

There is one exception, however. Faced with a similar demand for "all claims, formal or informal" alleging discrimination, Judge Cote limited her enforcement order to formal complaints, and crafted a limited definition of the meaning of that term. Once again, absent an opinion, the reasoning behind that limitation is not explicit. But it is not difficult to supply. Like Judge Cote, I find that the meaning of "informal complaint" is unduly vague, and that even the more limited term "formal complaint" requires some definition in order to be reasonably understandable. Moreover, in a company the size of Morgan Stanley, with over 93,000 employees in 500 offices worldwide, attempting to comply with a demand for all "informal complaints," even if that term could somehow be clearly defined, would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position, in order to determine whether any employees ever questioned the fairness of their treatment. The burden of such an inquiry far

---

15. As noted above, Judge Cote reached the same conclusion. *See EEOC v. Morgan Stanley & Co.*, 1999 WL 756206, *2, 1999 U.S. Dist. LEXIS 14661, at *6.

outweighs any value that a record of such "informal" griping might have for the EEOC's investigation. Accordingly, I decline to enforce the subpoenas insofar as they require production of "informal" complaints, and the order enforcing the subpoena will incorporate Judge Cote's careful definition in ¶ 8 of her order in the Schieffelin matter.

## CONCLUSION

In summary, then, the subpoenas will be enforced, except to the extent provided in the last paragraph of Part III of this opinion. No protective order will be entered, except to the extent provided in the last paragraph of Part II of this opinion. Counsel for the EEOC is instructed to prepare an order in accordance with this opinion as expeditiously as possible. Respondent will have one week from service of such order to comment.

## CONCLUSION

In summary, then, the subpoenas will be enforced, except to the extent provided in the last paragraph of Part III of this opinion. No protective order will be entered, except to the extent provided in the last paragraph of Part II of this opinion. Counsel for the EEOC is instructed to prepare an order in accordance with this opinion as expeditiously as possible. Respondent will have one week from service of such order to comment.

SO ORDERED.